## In Re Anonymous No. 28 D.B. 80, 29 D.B. 80, 30 D.B. 80

Disciplinary Board Docket nos. 28 D.B. 80, 29 D.B. 80, 30 D.B. 80.

## HEARING COMMITTEE REPORT

### SUMMARY

June 29, 1982—The hearings referred to herein involve three petitions for discipline filed at nos. 28 D.B. 80, 29 D.B. 80 and 30 D.B. 80, which are substantially identical and which were consolidated for hearing.

The petitions each contain one charge, namely, that between September or October, 1971 and December, 1974, while the three respondents (each of whom is named in a separate petition) were partners engaged in the practice of law, said respondents regularly paid sums of money to bail bondsmen as compensation for said bondsmen's referring criminal defendants to respondents. The petitions alleged that over $30,000 was paid by respondents to the bail bondsmen, representing a portion of respondents' fees in each "referred" case.

Respondents and Disciplinary Counsel entered into a stipulation admitting substantially all of the allegations of the petitions, but respondents moved

to dismiss said petitions based upon, inter alia, "staleness" and "selective prosecution." These motions were denied by the committee, which, after the initial hearing on the substantive issues, found that misconduct had occurred. Mitigation hearings then ensued.

The issues are whether respondents' conduct violated Disciplinary Rules 2-103(B), 2-103(C) and 3-102(A) (Respondents having stipulated that they did engage in the conduct alleged) *and* in view of the issues raised by respondents and the extensive mitigation testimony received on respondents' behalf, what if any discipline should be imposed.

The committee finds that respondents have violated Disciplinary Rules 2-103(B) and 3-102(A) and the committee recommends a private reprimand for each respondent.

## STATEMENT OF THE CASE

The three petitions for discipline were filed May 28, 1980, alleging that between October, 1971 (more than eight years prior to the date of the petitions)[1] and December, 1974, respondents were partners engaged in the practice of law. The petitions further alleged that respondents had an oral agreement with [A, B, C] and other bondsmen to pay sums of money to said bondsmen as a sort of "referral fee" for referring criminal defendants to respondents for representation.

Each respondent duly filed an answer admitting that respondents paid money to bondsmen but only when referrals resulted in respondents' being engaged (not for referrals per se). The fees paid to the

---

1. The original letters to respondents initiating these matters were dated October 24, 1978.

bondsmen were based upon the legal fee collected from the criminal defendant.[2]

Each respondent included with his answer a section entitled "New Matter" or "Affirmative Defenses" raising issues which were repeatedly raised in these proceedings, and which will be discussed in this report. These included:

(a) "Staleness"—Most of the payments alleged in the petition occurred more than six years prior to filing of the petition and many more than six years prior to the initial letter to respondents.

(b) "Selective Prosecution and/or Enforcement" —The facts giving rise to the instant petitions[3] became public in 1977 during an investigation by the United States Attorney for the Western District of Pennsylvania of bail bondsmen and magistrates. According to respondents, that investigation disclosed that many other attorneys also made payments of the sort involved here, but only respondents were prosecuted by Disciplinary Counsel, because respondents were the only ones who paid by check and who filed Form 1099's (reflecting the payments) with the Internal Revenue Service. Respondents claimed they were in fact penalized for being honest enough to keep records of these transactions and for making appropriate reports to the

---

2. Pursuant to motion of disciplinary counsel and permission of the hearing committee on November 4, 1980, paragraph 5 of the petitions for discipline was amended to reflect that referral fees were paid by respondents only when employment was secured by them.

3. It should be noted that these petitions originated from Office of Disciplinary Counsel, as opposed to the usual circumstance of complaints arising from some outside source.

Internal Revenue Service, whereas those less honest were not prosecuted.[4]

(c) Mitigation—Mitigation fell essentially into two categories. First, two of respondents claimed various personal pressures upon them (such as illnesses of their children, family deaths and other misfortunes) at the time of the misconduct diminished their judgment (and presumably lessened their culpability for their actions) and, second, all three respondents claimed their present positions as responsible and respected members of the bar and their good conduct since ceasing the practice complained of herein vitiated the need for discipline. Two of the three have had no other disciplinary actions brought against them. Respondent in 29 D.B. 80 had been respondent in a prior disciplinary proceeding. In 1977 he had been found by a Hearing Committee to have violated Disciplinary Rules 1-102(A)(4), 1-102(A)(5), 7-102(A)(6) and 7-102(A)(7) and said committee had recommended public censure. Public censure was ordered by the Supreme Court by order dated May 8, 1978.

In July, 1980, the instant petitions and answers were referred to Hearing Committee [   ] for disposition.

A pre-hearing conference was held before the entire committee on November 4, 1980. All respondents and their counsel were present. Various oral and written motions were disposed of. As stated

---

4. Although it may not appear of record, at the pre-hearing conference on November 4, 1980, Assistant Disciplinary Counsel conceded that 11 attorneys may have been involved in the alleged misconduct. Attorneys for respondents indicated at various times that the number involved was much higher. No other names ever surfaced during any of the proceedings.

above (footnote 2), Disciplinary Counsel was permitted to amend Paragraph 5 of the petition to reflect that referral payments were made only when respondents were actually engaged as counsel. Respondents were permitted to include their "New Matter" as part of their answers, although respondents' motions that Disciplinary Counsel be directed to reply to same were denied. Respondents' motions to dismiss the petitions were denied. Respondents' motions for severance of that part of the hearing relating to mitigation evidence were granted. These rulings were embodied in an order dated November 4, 1980, which appears of record. The hearing was set for December 18 and 19, 1980, and the parties were directed to prepare a stipulation of facts prior to said hearing.

At commencement of the hearing on December 18, the parties did submit to the committee a stipulation signed on behalf of all parties. (Petitioner's Exhibit (hereinafter "PE") 1; Notes of Testimony (hereinafter "NT") 8). The stipulation admitted that respondents engaged in the conduct alleged in the petitions, namely that during the period between September 27, 1971 and December 30, 1974 they issued 138 checks in a total amount exceeding $38,475.25[5] to various bail bondsmen as fees for referrals of criminal defendants to respondents or their firm, said fees being a percentage of the legal fee charged the criminal defendant. (List of checks attached as Exhibit "A" to PE 1). Assistant Disciplinary Counsel offered the stipulation into evidence, along with the three Petitions and Answers thereto (with attachments), and thereupon rested petitioner's case.

---

5. The total is not complete because the amounts of some of the checks were not known.

Respondents then called witnesses in an effort to prove that they were victims of so-called selective prosecution and/or enforcement. Counsel for respondent in 30 D.B. 80 submitted a legal memorandum in re his contention that selective prosecution was a substantive defense to these charges, although he conceded in the memorandum and on the record that he had no authority to support the application of this defense to disciplinary proceedings. Although the committee did not rule specifically that selective prosecution was a defense to a disciplinary charge, it did permit respondents to raise the issue in their answers and, therefore, agreed to hear witnesses in support thereof.

Counsel for respondent in 30 D.B. 80 thereupon called as a witness, [D] Assistant United States Attorney for the [   ] District of Pennsylvania. (NT 30) [D] had prosecuted several cases involving violation of the so-called RICO Act, premised upon corruption in the dealings between certain magistrates and bail bondsmen. A prominent local bail bondsman, [A][6] testified in the RICO cases as a prosecution witness after a plea bargain and under a grant of immunity. In late 1977, while the above-mentioned prosecutions were pending, an article appeared in the [   ] Post-Gazette concerning [A] and lawyers, and [D] testified that at that time he received a call from Assistant Disciplinary Counsel [   ].[7] (NT 45-46) [Assistant Disc. Counsel] inquired

---

6. Referred to as [A] in the petitions herein.

7. Ultimately the article (from the [   ] Post-Gazette dated November [   ] ) (Respondents' Exhibit (hereinafter "RE") A) was admitted into evidence and Assistant Disciplinary Counsel [   ] stated on the record that he became aware of the article on about the day it was published and retained it in his file on

of [D] whether the statements in the article had any substance, and whether the U.S. Attorney's Office could provide Disciplinary Counsel with information regarding lawyers who paid money to [A] for referral of clients. [D] responded that nothing could be provided until the RICO prosecutions were concluded. [A] was given a new identity under the Federal witness protection program, but in February, 1978, the U.S. Attorney's Office made [A] available for an interview by Messrs. [ ] of the Office of Disciplinary Counsel. In early 1978, Disciplinary Counsel had inquired of [D] how Disciplinary Counsel could talk with [B] (another bondsman) and [A], and [D] had advised that both were under the Federal witness protection program. On May 25, 1978, pursuant to a motion by Disciplinary Counsel under Rule 6(e) of the Federal Rules of Criminal Procedure, the Federal court ordered the U.S. Attorney to produce for Disciplinary Counsel Grand Jury documents relating to payments of fees by attorneys to [A] or other bondsmen. [D] testified that during their pre-trial interviews and during the above-mentioned trials, [A and B] indicated that they had agreements with lawyers "to receive [as a referral fee] 50 percent of the fee paid by the client for the preliminary hearing and one-third of the fee paid by the client to the lawyer at the trial . . . " [D's] best recollection was that approximately 40 lawyers were involved in referral payments. [D] testified that [A], on cross-examination in one of the RICO cases, was asked about the fee-splitting with

the so-called bail bond cases. That article names these respondents as having paid "kickbacks" and also states: "In addition to [respondents] the names of eight other lawyers are included in the affidavit [of FBI investigators] as having made payments to [A]." (RE A) The Affidavit itself was offered into evidence as part of RE D.

lawyers and [A] stated that in nearly every instance he and [B] would pocket the money (received in cash), not record it in their books, and not report it to the IRS, the only exception being the checks received from these respondents, which were recorded in [A's] ledgers. [D] testified at the hearing that he was not aware of any other checks from lawyers to bail bondsmen among the Grand Jury exhibits eventually secured by Disciplinary Counsel in May, 1978,[8] pursuant to the Rule 6(e) order. Furthermore, [D] testified that [A's] ledgers did not reflect fee-splitting payments from any lawyers other than respondents.

Respondents' counsel then examined [E], formerly an Assistant Disciplinary Counsel in [   ], who worked on the instant investigation. [E] recalled that this matter came to the attention of Disciplinary Counsel when the aforementioned Post-Gazette article (RE A) appeared in November, 1977. At that time the article was preserved and a so-called "Name only" file was opened.

[E] testified that he and Investigator [F], through arrangements with the U.S. Attorney's Office, met with [A] and his attorneys, and [E] questioned [A] regarding "referral fees" paid by lawyers to bondsmen. According to [E], [A] indicated that "upon his [A's] arrival in the [   ] bonding business that the system of referral fees amongst criminal lawyers and bondsmen was very prevalent" and [A] named lawyers other than respondents who paid kickbacks or referral fees. At that time, [E] also had in his file a resume of the Affidavit to the Search

---

8. This does not include disciplinary proceedings instituted against attorneys who happened also to be magistrates and were named as defendants and convicted in the RICO cases in Federal Court. It seems clear that those attorneys are in a separate category.

Warrant (RE D) which named five other lawyers in addition to respondents. [E] also had procured some additional lawyers' names from newspaper articles and recalled having about a dozen lawyers' names in his file before he talked with [A]. [A] supplied yet additional names. Referring to a memorandum he wrote following his meeting with [A], [E] had noted [A] named two additional lawyers (besides respondents) who paid referral fees by check, named another two lawyers who paid fees to him and [B] named two lawyers who engaged in a practice of "reduced bonds" wherein the lawyers and [A] split some of the bond posted by the criminal defendant, and named others who loaned him money and charged off their referral fees against the loan. In all, it appeared from [E's] testimony that approximately 25 lawyers were named by [A] as having been involved although as to details on some, [A] advised [E] he must talk with [B]. In all, [A] told [E] about three different activities engaged in by various attorneys: (1) paying referral fees; (2) charging clients more money for bonds than was actually paid to the magistrate; and (3) fixing cases with magistrates. [E's] memorandum listed the names of the approximately 25 lawyers implicated by [A] but complaint letters were sent to only the three respondents.

On cross-examination, Assistant Disciplinary Counsel [   ] elicited from [E] that [E] was informed by the U.S. Attorney's Office that it would be impossible to subpoena [A] to testify in a Disciplinary Hearing because the U.S. Attorney's Office "would not, under any circumstances, release his whereabouts . . ." [D] told [E] that if [A] and [B] didn't voluntarily cooperate with any disciplinary inquiries they could not be compelled to cooperate. However, [A], in his initial discussion with [E], in-

dicated he would cooperate, although he asked in return for his cooperation that his travel expenses be paid and also that Disciplinary Counsel speak to the Federal Judge on [A's] behalf in re his petition for reconsideration of sentence.

On the issue of why [E], as Assistant Disciplinary Counsel, did not pursue disciplinary actions against other lawyers, [E] testified that in his interview with [A], [A] told him he referred cases to respondents' firm "almost in totality." [A] did not indicate to what firm or firms other bondsmen in his office referred cases. [E] also testified that when he examined the ledgers of the [A] firm (after they were turned over to him pursuant to the 6(e) order) he didn't recall seeing any lawyers other than respondents referred to therein. [E] testified that of the approximately 25 lawyers mentioned by [A], [A] indicated he personally had done business with about half of them, more or less. [E] assigned two reasons why he chose not to proceed against other lawyers: (1) the difficulty "if not impossibility" of proving cases wherein the payments were in cash and could be supported only by oral testimony from persons like [A] with a record of criminal convictions; and (2) the difficulty of arranging for the appearances of [A] and [B]. [E] had no documentary corroborating evidence relating to any other lawyers.

On redirect examination, however, [E] acknowledged he never tried to procure from the FBI other checks from lawyers to bail bondsmen, which checks were allegedly turned over to the FBI. When said checks weren't among the Grand Jury documents secured by [E], he dropped the search for them. Also, [E] never inquired of [B] directly or indirectly whether he would cooperate with Disciplinary Counsel. [E] never attempted to interview

other [A] employees who were not in the Federal witness protection program. [E] also acknowledged that D.B.-7 letters, customarily sent by Disciplinary Counsel to lawyers against whom a complaint of misconduct has been lodged and asking for their explanation thereof, were not sent to any lawyers allegedly involved with [A], et al., except for respondents. [E] testified letters weren't sent because, despite the fact [E] knew of some "names," complaint files were never opened on other lawyers, and complaint files weren't opened because [E], and presumably others in the Office of Disciplinary Counsel, determined that oral allegations of wrongdoing by [A] did not constitute a sufficient basis for opening a complaint file. [E] stated: "At that point, the only thing we had was a bald assertion by [A] that cash had been paid in unspecified sums regarding unspecified criminal cases over an unspecified span of time." [E] acknowledged that had respondents not paid [A] by check and not filed 1099 forms with the IRS, and thus if there was no documentary evidence at all against them, then files would probably not have been opened as to them either.

[F], an investigator employed on the staff of Disciplinary Counsel in [  ] also testified. He testified generally on the procedures he used to substantiate the alleged charges against respondents, starting his investigation with the cancelled checks from the [A] records hereinabove referred to. [F's] testimony confirmed that Disciplinary Counsel had cancelled checks relating only to the three respondents named herein.

The hearing was then adjourned, at the concurrence of all parties, so that the committee could consider respondents' various motions, all, in effect, motions to dismiss based upon respondents'

claims of staleness and selective prosecution and/or enforcement. After receipt and consideration of briefs from the parties, the committee met and considered these motions. For reasons discussed in the discussion section herein, the committee determined that respondents' motions should be denied, found that respondents had engaged in misconduct, and ordered that mitigation hearings be scheduled, with each respondent to have a separate hearing on the mitigation issue. (Chairman [ ]'s letter to Disciplinary Counsel dated July 3, 1981.

The mitigation hearings were held on July 24, 1981. Each respondent had a separate, confidential hearing. The accounts of those hearings are given separately herein, so that if the board determines it is appropriate, distribution of this report to each of respondents can contain only the account of his own mitigation hearing and the accounts of the others can be deleted.

## 28 D.B. 80

Respondent in 28 D.B. 80 presented an impressive array of witnesses to testify as to his good character, his outstanding reputation and the high regard in which he is held by them. These witnesses included:

[G], a partner in the firm of [ ], who faces respondent regularly as an adversary in respondent's role as counsel to teachers' unions;

Dr. [H], Professor of Education at the University of [ ], who has had various contacts with respondent since 1972 in educational areas and who invites respondent to lecture in his courses at the University;

[I], former Judge of the Court of Common Pleas of [   ] County, and currently partner in the firm of [   ], who has known respondent since 1970 or 1971, and before whom respondent appeared many times both in court and, since Judge [I] left the court, in school-related proceedings wherein [I] was serving as an arbitrator;

[J], field representative for the Pennsylvania State Education Association (hereinafter "PSEA"), who has known respondent since 1969, and who has worked with respondent sometimes on a daily basis in connection with PSEA matters; and [K], General Counsel of PSEA, who by letter stated he has known and worked with respondent on PSEA matters since 1976.

Suffice it to say that the above-mentioned witnesses were unanimous in their praise for respondent. They lauded him for his legal ability, dedication, hard work and honesty. Each witness in his own way expressed the opinion that respondent is uniformly regarded as honorable and ethical and trusted by those who know him.

Respondent's wife also testified. Her testimony outlined respondent's personal/professional life prior to and during the time period covered in the instant Petition for Discipline. Briefly stated, she testified that respondent began his law practice in 1964 with his father, whom she described as a "tough cookie" who pressured respondent to excel. In 1970, respondent's father was found to have cancer and respondent was forced to carry on the law practice as well as attend to the emotional needs of his parents. Respondent was at times physically ill from the pressure. He took Valium and Darvon. Respondent's father died in May, 1971. Then, in October, 1972, one of respondent's twin sons, then five and one half, complained of foot

pain. The child's ailment was eventually diagnosed as cancer and in a third operation his foot was ultimately amputated. Chemotherapy was started and was continued until the end of 1974. Respondent's wife described the understandably horrible pressures the family endured during this period which caused the family to seek and receive psychiatric help. Respondent's wife testified that respondent was "humiliated" and "devastated" when his involvement in the fee-splitting arrangement with [A] was disclosed in the newspaper.

[L], respondent's psychotherapist, also testified. Although he has treated respondent only since December, 1978, [L], who has a master's degree in psychiatric-social work and is working on his doctorate, testified that from his history he took from respondent and also his observation of respondent, he concluded in 1978 that respondent was suffering from "a rather severe depression" associated with "continued unresolved grieving process related to the death of his father" and also "the fact that he perceived his son as being in a life-threatening crisis again." Although [L] testified at some length regarding respondent's mental and emotional state from 1971 through 1974, the weight to be given that testimony must be balanced by the fact that [L] didn't even meet respondent until 1978.[9]

Respondent also testified on his own behalf. He was valedictorian of his high school class, and was first in his law school class. His present practice consists principally of representing the Pennsylvania State Education Association and Pennsylvania

---

9. Respondent's first contact with [L] was in December, 1978, two months after the original letter from Disciplinary Counsel to respondent, which letter was dated October 24, 1978.

School Service Personnel Association in numerous counties in Pennsylvania and he has represented them since 1971. Respondent's testimony paralleled his wife's: he began law practice with his father; he respected his father and also feared him; he found himself responsible for his father and mother, as well as for the law office, when his father became ill with cancer; he began taking Valium and Darvon; because of financial pressures, so that office overhead could be shared, he entered into a partnership with the two other respondents in August, 1971. Respondent testified he met [A] through his father in 1968 or 1969 and, in the hope [A] would refer clients to him, he did various personal legal work for [A] without charge. [A] referred cases to respondent before the August, 1971, partnership was formed, but no referral fees were paid for those and respondent refused [A's] offer of a kickback on bond business he referred to [A]. After the partnership was formed, [A] informed the partnership that he would not refer any more cases without payment of a referral fee for each. Respondent was asked:

Q. "And so you accept responsibility for your knowledge of this as one of the three partners?

A. Absolutely."

Nevertheless, respondent testified his memory of the 1970-1975 time period, between his father's illness and the termination of his son's chemotherapy treatment, is "very hazy to me." Respondent told of the anguish associated with his son's cancer treatment and stated: "I don't think that I was capable of making the kind of judgment I would feel capable of making now."

"Q. You, nevertheless, accept full responsibility for the occurrences with [A]?

A. I want to make that very clear, that—that I am not attempting, by this, in any way escape that responsibility. The responsibility, that culpability, the shame, the humiliation is mine. It is mine."

Respondent's counsel also submitted exhibits marked W Ex 2 through 7 (originals of all exhibits are attached to the notes of testimony) consisting of a list of civic and pro bono professional activities respondent has undertaken without reimbursement and letters from clients and others lauding respondent and thanking him for his work. Although Disciplinary Counsel objected to admission of the letters, and such objection may have technical merit at least, the letters were represented as unsolicited, spontaneous expressions and were received as relevant to respondent's present standing in the community.

On cross-examination, respondent acknowledged that in January, 1970, respondent's father loaned [A] $10,000 to begin his bail bond agency, with the understanding [A] was to make monthly payments on the loan and, in addition, to pay respondent's father $1,000 a month as a retainer to represent the agency. [A] made only a few payments on the loan, and paid nothing on the retainer. Respondent ultimately wrote off the debt as uncollectible because "he [A] said he could not pay the loan payments, but he would try to refer some criminal cases to me." (NT 388) Disciplinary Counsel asked:

"Q. I see. Was there any relationship between the fact that [A] had sent you cases and your forgiveness of the debt?
[Objection to question overruled.]
A. That is hard to answer because I really, I really didn't—it is true, I didn't enforce the debt."

Respondent seemed generally honest and forthright on cross-examination and did not "duck" his responsibility for what had occurred. He acknowledged he had "done something wrong" and "had violated the Canons of Ethics of [his] profession." However, he also contended that "[a]t no time was any client charged more than that client would have been charged had there been no such arrangement with [A]" and "I don't believe that any client was ever harmed by that arrangement . . . "

### 30 D.B. 80[10]

Respondent in 30 D.B. 80 presented three witnesses in addition to himself. Dr. [M], a child psychiatrist, met respondent in November; 1970, in connection with treatment of respondent's then four-year-old son, who suddenly began falling down and was unable to walk for no apparent physical reason. After some improvement, the child's symptoms became more severe in the fall of 1971 and he was hospitalized. Dr. [M] felt the child was suffering from "a prepsychotic or psychotic reaction, very severe emotional disturbance, which was interfering with his general functions as a human being." In late 1971, the then five-year-old sometimes lost control of his bowel and bladder and had strange body movements. His speech sometimes was stuttering and other times he wouldn't talk at all. Extensive physical tests were done and nothing organic was found. Dr. [M] characterized respondent at this time as being "preoccupied with his son's well being." Then respondent's mother died sud-

---

10. Respondent's mitigation hearings were out of order in that the hearing in 30 D.B. 80 was heard before 29 D.B. 80 because of scheduling problems. The hearings are discussed herein in the order they appear in the notes of testimony.

denly in February, 1972, and respondent's father was chronically ill. These events, according to Dr. [M], "heightened [respondent's] despair." The son's condition did not improve and in late 1972 institutionalization of the child was even considered. Dr. [M] began in the spring of 1972 to treat respondent personally for psychiatric and emotional problems arising out of his son's illness. [M] described respondent during the period as "clinically depressed." Respondent's father died in 1973. Respondent's son began walking sporadically in late 1973, continued to improve in 1974, and by 1975 was attending public school full time, although at the time of hearing he was still seeing Dr. [M].

Also testifying on behalf of respondent was [N], one of the criminal defendants represented by respondent, upon whose case a referral fee was paid to [A]. [N] was charged with criminal homicide. He didn't know a referral fee was paid at the time it was paid, although he knew of the referral fee at the time of hearing. But [N] testified: "I feel, you know, I trusted [respondent] 100 percent. I feel that he gave, gave me, you know, the best," and stated that his entire family uses respondent for all their legal work. [N] testified that had he known of the referral fee being paid to the bondsman it would not have changed his opinion of respondent's devotion to [N's] case.

[O] also testified. In 1979, she engaged respondent to represent her nephew who was charged with simple assault and homicide. She testified she worked closely with respondent in his defense of her nephew and when asked if she would hesitate to recommend respondent to a prospective client, [O] stated:

"No, I would recommend him highly. I think he's

an exceptional individual. I think he works very hard for any individual and any client. I think he is extremely honest and ethical and I would recommend him with no reservation."

Respondent testified on his own behalf. He graduated from law school in 1966, worked for a law firm for two years, and then became an Assistant [   ] County Public Defender. He had always wanted to be a trial lawyer. He was first assistant Public Defender when he resigned in 1970 to devote full time to a partnership he had formed in 1969 with respondent in 29 D.B. 80. In August, 1971, the three respondents herein merged their practices. This respondent first met [A] after the new partnership was formed and he became aware of the prior relationship of [A] and respondent in 28 D.B. 80. Respondent was asked:

"Q. . . . when was it that or through whom was it that you first learned of the fee-splitting practice to which you have admitted?
A. When did I learn of it?
Q. Yes.
A. I didn't learn of it. I was a part of it. It wasn't, it wasn't a matter of learning. It is the crucial question. It is why we're here, and I know that that's involved in this situation. I don't think that I learned of it. I think that I knew they had a relationship before we formed the business. I think I said in my narrative, and still think, that is the way it was. We were approached by [B], and there were other people that worked there, but [B] had stated at some point that they wanted a new—they wanted a new relationship. He was the one who was doing most of the legwork for [A] at that time. When I say 'he approached,' I don't remember whether he approached me, [or the other respondents], but it was

understood that this is the way in which he wanted to do business at that particular point in time. I just can't remember specifically how.

Q. Prior to you personally meeting with [B], were you aware that any fee-splitting was going on?

A. No.

Q. All right.

A. I was aware that referrals were going back and forth when we formed the law firm, but I was not aware of any fee-splitting that was going on.

Q. What was the conversation with [B] that alerted you to the practice that we're here about?

A. I don't remember a specific conversation, I just remember that it was said, whether it was to me [or one of the other respondents] I can't remember at this time, but it was said do you want to do business? Pay for it. That's what everybody else is doing that does business with bail bondsmen, words to that effect. And this is the way you want to do it, you know, to continue the relationship, that I am doing more of the work than [A] is and I want you to split fees.

Q. How long had the three of you been in business together physically when this conversation occurred with [B]?

A. Within a few months, I believe. I couldn't pinpoint the exact date, but I knew from the checks that they started pretty—the end of September. At least that's when the first check was documented. So it had to happen the first couple months, obviously."

Respondent frankly admitted that when he became aware of the practice of fee-splitting he knew it violated the Canons of Ethics. With respect to the decision made by the partnership to pay referrals by check and report same to the IRS, respondent testified:

"It probably had to do with an innate ability of either sizing somebody up in terms of just if this is the way we were going to do business, and made a conscious design to do business this way, I knew it wasn't right. I said to myself, and I don't remember whether I said it to the other people or not, at that particular time, I said but I am not going to fool around here with this stuff. If they want to do business in this way, I am going to submit forms to the Internal Revenue Service. I don't want any cash payments and transactions going back and forth here." (NT 465)

Respondent became understandably emotional when he discussed his son's serious health problem and stated:

"I was absolutely obsessed with what was happening and had no idea how to grasp onto it. It took about a year, a year and a half, with consultations with people all over—the United States. Finally, we were able to get a hold of this thing." (NT 469)

Respondent's "relief" he said was trying cases and wrapping himself up in somebody else's problems. Nevertheless, he frankly acknowledged:

". . . it [his son's problem] did not at all interfere with my function to know. It was still a violation of the Disciplinary Rules. So, I an not coming from left field on this thing. I didn't—with the illness of my son, it wasn't like I knew or that I was wrapped up in this and I didn't know what was going on. I knew what was going on. I was just totally preoccupied trying to figure out what in God's name had taken place here because nobody in the United States seemed to be able to figure out what was wrong with my kid."

Although respondent contended his judgment

was affected by his son's difficulties, he acknowledged that he wasn't talking "about insanity or knowing right from wrong" and that "I should have absolutely known better." Respondent was asked:

"Q. Did you stop to appreciate the seriousness of the fee-splitting practice?

A. I didn't stop to appreciate anything at that period of time. I went through years—not days, not weeks, not months—years of not being able to talk about anything else with my wife. So that what ended up happening is here after enough years, all we did was work on this kid's illness.

Q. . . . as a result of this business coming into the firm from [A], how many cases did you actually participate—handle yourself?

A. Of the cases, I think there was about ten cases that I handled over that period of time. I know there's nine listed in that sheet. I put down nine or ten cases that I handled at that period of time."

Most of the [A] cases respondent handled were drug cases and respondent contended each client received adequate representation and excessive fees were never charged. Respondent signed many of the [A] checks but that is because he was located close to the secretary and routinely signed most of the checks. The signature on the check to [A] bore no relation to who handled the case. Respondent acknowledged, however, that he knew what the checks were for.

Respondent stated that, aside from the instant matter, he has never had a disciplinary complaint lodged against him.

Respondent described his feelings when the [A] involvement became public by way of the newspaper publicity:

"It was much, much more than embarrassment.

It was — I mean — it was for a time very detrimental to me, extremely detrimental. There was more than one article and there was a lot of things being alluded to in our legal community and outside of the legal community. There were background checks being done by FBI agents and things of that nature that it certainly was not only embarrassing to myself and my family, but it frightened me terribly, especially with the kind of work that I am in and knowing what the ramifications are of that type of investigation."

Respondent's partnership terminated in April, 1976. Although respondent had done mostly personal injury work when a partner with the other respondents herein, since 1976 he has concentrated on criminal work and over half of his cases are referred by other lawyers. Respondent testified, with respect to possible effects of this disciplinary proceeding:

"I am deeply concerned that any exposure or any publicity that would create that type of a position would certainly, in my opinion, have a harmful effect or could have a harmful effect on my ability to continue to practice law in that area, which is referrals from other lawyers."

Respondent conceded he never considered walking away from the firm because of the fee-splitting practice, but contended:

" . . . I did not have the appreciation of the seriousness of what I was into at that particular time. I lacked a lot of maturity and experience. I like to think, now looking back, that it had a great deal to do with my son's illness. I can't answer that. I know I'm here presenting it as a defense in terms of mitigation as to what happened. I know my thinking was clouded at that time, but I didn't have a real

good conscious appreciation of the seriousness of what was happening. My thinking was, was impaired by youth, being young and personal problems that I was having at that particular period of time. It was stupid.

．．．

". . . I certainly knew what the heck we were doing at that particular time in terms of, you know, having the same Code of Ethics, as far as that is concerned."

In closing, respondent stated:

"It couldn't happen today because I wouldn't let it happen. I am an ethical lawyer, which says that, in my own sense and values, which I have today, I have respect for the Code of Ethics. It is obvious that I didn't have that respect back in 1971 to 1974 as to what was going on. I enjoy practicing law. I think I'm very lucky because I do mostly every day what I like to do. I consider that extremely lucky, that is, as a lawyer. It wouldn't happen again, couldn't happen again. I wouldn't let it happen again. I went through a very, very, very trying period of time during—it is coincidental, and I know [the respondent in 28 D.B. 80] had the same thing with the cancer of his son, we used to spend a lot of time crying in the beer.

"There are different situations. I am in a different phase of my life. I am not saying to you that you shouldn't punish me because it happened seven years ago, between seven and ten years ago. I would like to think that I brought in [N] here because he symbolized that whether the case came in as a fee-split or came in like [O] came in, I represented her nephew, I gave it the same effort.

"I think that I am a good lawyer. I think I have a lot of integrity. I think I'm ethical. I consider it a

privilege to continue to practice law in the same fashion. I am truly sorry that I was so stupid in 1971 for all of the different reasons that went on at that particular period of time. It would not happen again."

On cross-examination respondent was asked:

"Q. Is there any doubt in your mind that it [the decision to pay referral fees to bondsmen] was clearly understood and agreed to by all three?

A. Absolutely. It absolutely was clearly understood by all three."

Respondent was asked by Assistant Disciplinary Counsel if the reason the firm paid the bondsmen by check was so they could deduct those amounts from the firm's income. Respondent replied that the amounts were deducted from the firm's income, but the reason checks were used was "to obey the law." Respondent said when the bondsmen received the 1099 forms: ". . . this really aggravated these guys. That's when they started sending it to all the other lawyers, because they got these forms from the Government saying you owe us taxes on this money and that upset the hell out of them . . . "

Respondent discussed what he perceived to be the purpose of the Rule he was charged with violating and discussed why the practice he engaged in was wrong. He acknowledged that splitting fees with nonlawyers "aside from the Code of Ethics, . . . . is not the appropriate way for a professional to conduct himself."

## 29 D.B. 80

Respondent in 29 D.B. 80 presented no other witnesses in his mitigation hearing, but testified on his own behalf.

Respondent graduated from law school in 1966.

He is active in the American and [   ] County Bar Associations and several weeks before the mitigation hearing was invited to join the American Board of Criminal Lawyers, an organization joined only upon recommendation and invitation.

Respondent was two years out of law school when he formed a partnership with the respondent in 30 D.B. 80; the two of them merged with the third respondent in mid-1971 and that firm dissolved in 1976. Since then, respondent has been a sole practitioner limiting his practice exclusively to trial work, 70 percent of which is criminal.

During 1971 through 1974, respondent was trying between 75 to 80 criminal cases per year, of which approximately 20 were cases referred by [A] (82 cases in all during the period). Respondent supplied a list of the 82 "[A]" cases, showing the client's name and other particulars. Respondent testified that once the case was referred:

". . . the bondsman had no further input into whether or not we represented a client or whether or not the client chose to retain us or how we handled the case. That was none of their affair, that was none of their business. And, as I say, there were many clients who chose not to retain us or clients who chose not to choose us after the preliminary hearing or other various stages of the trial. So, once the client was introduced to us, that was the end of the bondsman's involvement in the attorney-client relationship."

Respondent testified that he had a relatively standard fee for drug cases, which comprised 90-95 percent of the [A] referrals. He charged $250 for the preliminary hearing and $500 for the trial, and the fee to the client was the same whether or not a referral fee was paid to [A]. Respondent testified:

". . . I think it would be, I have always felt this

way, I think it would be grossly unfair to charge A client more money than you would charge client B for a comparable case because you had to share the fee with somebody else. I have never done that. I never would do that."

Respondent further testified:

"In terms of the quality of representation, I have always prided myself on being a good criminal lawyer. I think that I enjoy a good reputation in the community. I have always attended seminars. I have always kept up with whatever is current in the field. I find it, being involved in these national associations, it's been very educational to me to meet with lawyers from other parts of the country and find out how cases are being handled in other places. I have always prided myself on being very well prepared and handling a case professionally."

•  •  •

". . . As a criminal lawyer, I, I am basically a non-judgmental person, and I supose that is one reason why I am able to specialize in criminal law and many other lawyers are not able to. It's very rare that someone comes to me with a case that I feel that I can't handle because it bothers me morally, ethically or philosophically. I have a difficult time with sex cases. I don't, I don't do much of that kind of work. I know that there were some cases referred from the [A] Agency that were particularly heinous rape cases or involving child molesting or that type of thing. I just felt that I really couldn't, couldn't go into court and give it my all. So, I found that I had turned down some of those kind of cases and I probably would in the recent past have turned down some of those, too. But basically, we were not basically—there was no obligation for us to accept any case that was referred in by the [A] Agency, just

as there was no obligation for any person they referred in to use our services."

When asked why he agreed to pay referral fees to bondsmen, respondent replied:

"Well, needless to say, I have had a lot of time to think about why we conducted business in this manner. It seems to me that there was really no conscious thought process, that this was either a proper or an improper way to do business. I can only tell the Committee that almost every one that I was in daily contact with, who was handling criminal cases, was doing business in this way. It wasn't a secret—it wasn't something that was particularly hushed up. People seemed to be doing it fairly openly. And I am sure that I always realized that it was a violation of the Code of Ethical Conduct, I am sure I always realized that, but never consciously thought about it because it seemed to be one of those things that nobody paid much attention to.

"This was even more so amongst people I knew who were handling personal injury cases at the time. The lawyers I worked for conducted business this way.

"When we joined with [respondent in 28 D.B. 80], his father, who was a highly respected and successful lawyer, conducted business this way. And I guess I really didn't consciously think that this is improper and we shouldn't do it. I haven't conducted business this way since we stopped doing business with the [A] Agency. I certainly wouldn't do it today. I am sure I realized it was unethical at the time. It just seems that everybody was doing it and it wasn't a practice that anyone was particularly concerned about."

Respondent further suggested that the criminal defendants referred by [A] needed counsel (if it

wasn't an elective situation whether or not to retain counsel) and by referral to respondents' firm they got "competent, effective representation" and "weren't charged anything additional by way of fee . . . " Although respondent stated he clearly knew ethical rules were being violated he "always felt that no one was being harmed" (NT 551; 553) and, moreover, "that this was in some way a service to these people" because the lawyers (respondents and others) to whom [A] referred them "are good, competent lawyers, skillful lawyers."

Respondent wasn't sure that the choice to file 1099 forms with the IRS was "a real conscious process." He said: "There just didn't seem to be any reason to handle this surreptitiously." He thought [A] wasn't happy about being paid by check but [A] had no "input" on the matter. Respondent had no knowledge at the time in what way other lawyers were paying the referrals.

On cross-examination, Assistant Disciplinary Counsel probed respondent's understanding of the reason for the rule prohibiting fee-splitting. Respondent rather frankly admitted:

". . . I have a lot of trouble finding a serious justification for the rule. I don't wish to get into a philosophical argument with you about the rule. It is on the books. I have always been frank to admit that I violated it. I have a lot of trouble perceiving its justification. I suppose I did some research on it some time ago and I think that the early historical underpinnings for the rule was that it was perceived to be unseemly for a professional person to share a fee with a non-layperson. (sic) I think that was the historical underpinning for the rule. I think that today it is more difficult to justify. (NT 556)

Respondent did not think that failure to tell the

client about the referral fee breached any duty of fidelity a lawyer owes to his client, unless the client paid more because of the referral fee. But, on the other hand, he did find objectionable the practice other lawyers engaged in (which was allegedly widespread) of receiving a kickback on fees the client paid for a bond.

Assistant Disciplinary Counsel then offered into evidence, pursuant to Disciplinary Board Rule 89.151(b)(9), the hearing committee report and report and recommendation of the Disciplinary Board in a prior disciplinary proceeding against this respondent, docketed at no. 29 D.B. 77. That proceeding involved conduct which apparently occurred in the period 1974-1976, and as a result of said conduct respondent was charged with violations of Title 18 USC §401(1) and (2) and entered a plea of guilty in the U.S. District Court for the Western District of Pennsylvania. (PE 7; hearing committee report, page 4) In the disciplinary proceeding, respondent was found by the board to have violated Disciplinary Rules 1-102(A)(4), 1-102(A)(5), 7-102(A)(6) and 7-102(A)(7) and was subjected to public censure by the Supreme Court in September, 1978.

Respondent addressed the matter of the prior disciplinary proceeding. He stated that it arose from an isolated incident in which respondent became involved beginning in 1974. Respondent did not deny engaging in the conduct and the disciplinary hearing was only to determine the appropriate form of discipline. Respondent testified:

". . . The prior misconduct was something that I considered to be very serious and I felt that—that the imposition of public censure was very appropriate in that particular case.

"The thing that I would like the committee to understand is it is very difficult for me, I think to say, is that public censure really bothered me. It is something that I took very seriously. I was very troubled by my conduct in that incident. I was very troubled by being publicly censured by the Supreme Court, although I did feel that it was certainly appropriate, if not lenient, discipline.

"Although it is something that happened, the public censure part of it is something that happened and received really very—a lot of publicity in this city because I've—I've always managed to get in the newspapers a lot because of the cases that I try. And I think it really received a lot of prominence. It is really something that even though it happened three years ago, I've never stopped carrying it around with me. I hope it is, at some point, it will be something that I can put far behind me, but I haven't been able to yet. It is just something that I took very seriously and I always carry it around in my head.

"I hope that that won't be a reason for the Committee to consider imposing a public discipline in this case, when it might otherwise consider private. I don't know. I don't want to be presumptuous, and I hope I am not speaking out of turn, but I—I feel that if I don't speak up, I will be upset that I didn't at some later point. I just wanted to try to kind of put it into perspective."

The parties had filed rather extensive briefs after the initial hearing, going essentially to the issues of "staleness" and "selective prosecution," but no briefs were filed after the mitigation hearings.

It was alleged in the Petitions for Discipline that the conduct of respondents violated Disciplinary Rules 2-103(B), 2-103(C) and 3-102(A). As to each

of respondents, Assistant Disciplinary Counsel suggested that the committee recommend public censure as the appropriate form of discipline.

## FINDINGS OF FACT

Based upon the stipulation of the parties, the testimony and the exhibits of record in this case, the committee makes the following findings of fact:

1. Petitioner, whose principal office is located at 100 Pine Street, Harrisburg, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid Rules.

2. Each of respondents is an attorney admitted to practice law in the Commonwealth of Pennsylvania and subject to the Code of Professional Responsibility and the Disciplinary Rules thereunder.

3. During the period September, 1971, through December, 1974, respondents practiced law together in a partnership.

4. Between September, 1971, and December, 1974, respondents worked under a continuing oral agreement with [A], [B] and other bondsmen associated with a bonding agency or agencies known, variously, as [A] Agency, Inc., [A-B], and the [P] Agency.

5. Pursuant to the above-mentioned oral agreement, the above-named bondsmen would recommend to criminal defendants the employment of the individual respondents, or their firm, as defense counsel and, as to cases which resulted in such

employment, the respondents, or one of them as a partner of the others, or on behalf of their firm, regularly paid sums of money to the above-named bondsmen or their agency, by checks drawn on the accounts of the firm.

6. Between September, 1971, and December, 1974, respondents paid in excess of $30,000 to the above-named bondsmen or their agency as to such employment of the individual respondents or their firm.

7. The amount of the respective payment made to the bondsmen or their agency in regard to each client was based upon the amount of the fee collected by the individual respondents or their firm from each client.

8. The payments representing referral fees paid by respondents' firm to said bondsmen are listed on Exhibit A to PE 1, and said list enumerates 138 checks covering the period September 27, 1971 through December 30, 1974, in the total amount of $38,475.25. Seven of the 138 checks were not available and the amounts thereof were unknown.

9. Each of respondents had knowledge of and participated in the referral fee arrangement with said bondsmen.

10. Each of respondents professed contrition for his part in the referral fee arrangement, each acknowledged violating the Disciplinary Rules, and each indicated he would not repeat this conduct.

11. Respondents in 28 D.B. 80 and 30 D.B. 80 have not been respondents in any other disciplinary proceedings and, as far as can be determined by this committee, have otherwise abided by the Disciplinary Rules and are respected practitioners.

12. Respondent in 29 D.B. 80 was a respondent in a prior disciplinary proceeding but that conduct occurred in the years 1974 through 1976 and re-

spondent has not been charged with any disciplinary violations in subsequent years.

13. As to each of respondents, the behavior which is the subject of the within proceedings had ceased more than three years prior to these proceedings being instituted.

## DISCUSSION

The instant proceedings were not instituted by a disgruntled client. They were instituted by the Office of Disciplinary Counsel following disclosure in a November, 1977 [  ] newspaper article that respondents had paid referral fees to certain bondsmen who were then (in 1977) under investigation by the U.S. Attorney's Office for various unsavory practices which were unrelated to their dealings with respondents. Respondents' firm was identified in said article and respondents testified that they were embarrassed, if not disgraced, by the newspaper publicity.

There is no question that the conduct complained of occurred. There is also no question that it occurred during the period September, 1971 through December, 1974. It had ceased nearly three years before news of it surfaced in the newspaper. It had ceased almost six years prior to the filing of the petitions for discipline.

The facts alleged in the instant petitions are essentially not disputed by respondents. Respondents have, however, offered various arguments and evidence in defense and/or mitigation, which arguments merit discussion.

Respondents moved to dismiss the petitions because of "staleness" and "selective prosecution." It is not clear to the committee whether it, in fact, has the power to dismiss a petition (as distinguished

from the power to recommend that no discipline be imposed). It was not necessary to reach that question, however, since the committee determined that the above-mentioned arguments had no merit. It was clear that Disciplinary Counsel had received no complaints and had absolutely no knowledge of respondents' misconduct until the November, 1977, newspaper article. Investigation was begun in timely fashion, as outlined in then-Assistant Disciplinary Counsel [E's] testimony, and letters from Disciplinary Counsel to respondents were sent in October, 1978. The petitions for discipline were filed in May, 1980. Some of the delay in proceeding with these cases after learning of the misconduct in late 1977 was occasioned by the need to deal through the U.S. Attorney's Office in an effort to interview Bondsman [A], who was under the Federal Witness Protection Program, and through the United States District Court to obtain critical documents. In other words, the usual avenues of investigation were not available here. Therefore, the delay which occurred is understandable under the circumstances.

The so-called selective prosecution argument is most intriguing. Throughout the hearings respondents suggested that numerous other attorneys did what they did. Indeed, respondent in 29 D.B. 80 stated that "almost every one that I was in daily contact with, who was handling criminal cases, was doing business in this way." The numbers varied from about ten others to perhaps 40 others. Nobody knew for sure how many—and no other attorneys were specifically named in the hearings, and therein lies the problem. If nobody knew "who" or "how many" then Disciplinary Counsel can hardly be charged with failure to prosecute any "others." [E] acknowledged he heard some other attorneys'

names from Bondsman [A], but it was undisputed that no hard evidence existed as to any attorneys besides respondents. Assistant U.S. Attorney [D] testified he was not aware of any other checks from attorneys to bondsmen among the Grand Jury Exhibits and he also testified that [A's] ledgers did not reflect fee-splitting payments from any lawyers other than respondents. Hard evidence existed of these respondents' involvement with [A] because they paid the referral fees by check, and reported the same to the Internal Revenue Service, whereas the "others" presumably compounded their infractions by paying the referrals in cash.

Respondents filed briefs addressed to the selective prosecution defense but acknowledged that they could cite no precedent for applying it to disciplinary proceedings. However, it is really not necessary for this committee to decide whether or not selective prosecution should apply as a defense in these proceedings. Viewed in a reasonable way, it cannot be said that Disciplinary Counsel was arbitrary or capricious in failing to proceed against any "others." Disciplinary Counsel had received no complaints against any others, had no concrete evidence that any specific attorneys were involved, and had no reasonable prospect of proving charges against any others. The committee is inclined to agree that others besides respondents were probably engaged in this practice. Nevertheless, the fact that others might be involved and could not be prosecuted certainly would not justify Disciplinary Counsel's "excusing" those who clearly were involved and should be prosecuted. It may fairly be said that for every respondent named in any disciplinary proceeding there are probably other attorneys engaged in the same conduct who go undetected. This is most unfortunate. But the discipli-

nary structure would crumble if *no* proceedings could be brought unless every violator of a particular rule were charged. It would be tantamount to requiring, in the criminal justice system, every burglary case to be stayed until every burglar at large could be charged. Thus, since there was no evidence that Disciplinary Counsel arbitrarily or unfairly determined not to bring disciplinary proceedings against any specific attorneys, while choosing to proceed against respondents, the committee believes that selective prosecution is not an issue herein.

As noted in the statement of the case, after the initial hearings in December, 1980, the committee made an informal finding that misconduct had occurred and in July, 1981, each respondent presented mitigation evidence. That evidence was outlined in detail in the statement of the case because of its importance in determining disposition of this matter. By way of summation, it may be said that respondents in 28 D.B. 80 and 30 D.B. 80 each presented witnesses who testified as to his current status as a respected and trusted member of the bar. Each presented evidence of personal pressures during the 1971-1974 period resulting from illness and death of a parent coupled with tragic, serious and long-term illness of a young son. Each respondent himself had sought psychological help as a result of extreme pressures brought upon him during the period. Neither, to his credit, denied responsibility for his misconduct but suggested that these outside pressures and circumstances contributed to a diminished sense of judgment. Each was adamant in accepting responsibility for what he had done and each was equally firm that he knew the conduct was wrong (and had always known it

was wrong) and would never engage in the conduct again.

Respondent in 29 D.B. 80 testified in his own behalf. Although he presented no witnesses to testify as to his present status as a respected and upstanding member of the bar, the committee has no reason to think otherwise of him. Likewise, he presented no evidence of personal family pressures which might have diminished his judgment. Furthermore, this respondent was the subject of a prior disciplinary proceeding, as a result of which the Supreme Court ordered imposition of public censure as appropriate discipline. It should be noted, however, that the prior proceeding involved conduct which occurred toward the end of the period involved in this proceeding and was unrelated. Respondent acknowledged that he was profoundly affected by the discipline imposed in the prior proceeding and stated that even though the discipline was imposed three years ago he has "never stopped carrying it around with me." Nevertheless, in comparing the testimony of the three respondents, it is obvious that respondent in 29 D.B. 80 felt he had not done anything seriously wrong. He characterized himself as a "non-judgmental person" and credited his success as a criminal attorney in part to that quality in himself. As for the referrals paid by his firm, he contended at the hearing that almost everyone was doing it as if that were an excuse. He conveyed no real remorse for his actions, no sense of any harm actually being done to anyone. In fact, he and his counsel actually argued that the referral fee system "helped" the criminal defendants because they were referred to "competent" counsel sooner than they otherwise might have been. It is unsettling to hear this respondent express such an

attitude. Although he stated he would not engage in the fee-splitting conduct again, he seemed to base that decision on his feeling that such fee-splitting is "unprofessional" rather than unethical. There is a difference, of course, and it is disturbing that this respondent, unlike the other two, sees no inherent evil in the fee-splitting practice. Although the committee deems it unfair to impose a more serious discipline upon respondent in 29 D.B. 80 than upon his co-respondents, since they are equally culpable, the committee nevertheless wishes to note its reservations about this respondent's attitude toward the fee-splitting prohibition.

Each of respondents suggested that nobody was really "hurt" by the fee-splitting practice, contending that their "referred" and "non-referred" clients received the same level of service for the same fee. However, this practice clearly "hurt" other attorneys whose ethics precluded a fee-splitting arrangement and who thus evidently received no referrals from [A] and the other bondsmen. Respondents, on the other hand, got close to 200 referrals from [A], et al. Respondents benefitted financially to the detriment of the bar at large. The committee believes it appropriate to also note that these referrals probably led to additional referrals, not from [A] necessarily, but from the clients referred, who would not have known of respondents but for [A]. (See, for example, testimony of one of the "referred" criminal defendants who stated his entire family now uses one of respondents for all their legal work.

Respondents were charged with violating three Disciplinary Rules, and they clearly violated D.R. 2-103(B) and D.R. 3-102(A). There was no proof, however, that respondents "requested [[A], et al.] to recommend or promote the use of [their] serv-

ices . . . " (D.R. 2-103(C) ) Disciplinary Counsel suggested that by *paying* referrals respondents implicitly requested more referrals, but the committee declines to find a violation based upon a mere implication.

The violations of the above-mentioned Disciplinary Rules are serious. Whether or not "everybody" was doing it—and certainly everybody was not!—the conduct was nonetheless shameful. Under different circumstances a severe form of discipline would be in order.

Disciplinary Counsel has suggested public censure as appropriate. However, since the purpose of the disciplinary system is not to punish, but to protect and serve the public interest, the committee recommends a private reprimand for each respondent. Respondents long ago ceased the fee-splitting practice and have during the last six years apparently conducted themselves properly. The public would not be served by holding these respondents out for public discipline at this time, and public discipline would cause respondents to suffer great injury to their practices and reputations. The committee is convinced that these respondents are no "threat" to the public and there is no justification whatsoever for ruining their present lives by holding them out as "examples" to the bar that fee-splitting will not be tolerated. Respondents have erred; they have acknowledged their error; and the committee therefore believes a private discipline will suffice.

## CONCLUSIONS OF LAW

1. During the period September, 1971 through December, 1974, in compensating persons as a reward for having made recommendations resulting

in employment of respondents or their firm by clients, each of respondents violated D.R. 2-103(B).

2. During the period September, 1971 through December, 1974, in making such payments to persons who were not lawyers, in amounts which reflected a proportion of the fee collected by respondents or their firm from each client referred, and thus sharing legal fees with a non-lawyer, each of respondents violated D.R. 3-102(A).

3. There being no proof that respondents "requested" the above-mentioned referral of clients, respondents did not violate Disciplinary Rule 2-103(C).

## RECOMMENDED DISPOSITION
## OF THE PETITIONS

The stipulation and evidence presented to the committee clearly indicates that respondents violated Disciplinary Rules 2-103(B) and 3-102(A). However, the evidence also indicates respondents had discontinued this conduct prior to its being made public, and evidence also indicates that respondents are at present respected members of the bar. Therefore, the committee recommends that a private reprimand for each respondent would be appropriate.

## DISCIPLINARY BOARD ORDER

And now, June 29, 1982, the Report and Recommendation of Hearing Committee [   ] dated May 5, 1982 is accepted; and it is ordered and decreed, that the said [respondent] of [   ] County, be subjected to a private reprimand by the Disciplinary Board of the Supreme Court of Pennsylvania as provided in Rule 204(5) of the Pennsylvania Rules of Disciplinary Enforcement at the next session of this board.